IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | **UNDER SEAL** |
| 575 SOUTH 12TH ROAD # 1516 ARLINGTON, VIRGINIA 22202 (TARGET LOCATION 1) | Case Nos. 1:20-sw-1540 |
| | 1:20-sw-1541 |
| 4617 NORTH 13TH STREET ARLINGTON, VIRGINIA 22207 (TARGET LOCATION 2) | |

**AFFIDAVIT IN SUPPORT OF APPLICATIONS
UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE**

I, Stacey Ivie, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for warrants to search the premises known as 575 South 12th Road #1516,

Arlington, Virginia 22202 (hereinafter, "TARGET LOCATION 1") further described in

Attachment A-1, and the premises known as 4617 North 13th Street, Arlington, Virginia 22207

(hereinafter, "TARGET LOCATION 2") further described in Attachment A-2 for the items

described in Attachment B.

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that

evidence of criminal violations of 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute

controlled substances) will be located at TARGET LOCATION 1 and TARGET LOCATION 2

which are both used by Brandon Lorenzo WILLIAMS, a/k/a "Bubba" and "Sparks."

3.      I am a Police Detective with the Alexandria Police Department ("APD") where I

have been employed since 2002.  During my employment with the APD, I have been a detective

for over fourteen (14) years and have investigated numerous types of crimes including, but not limited to, fraud, money laundering, narcotics trafficking and organized crime. I have conducted and/or participated in numerous narcotics investigations resulting in the arrest and/or conviction of drug distributors and the seizure of quantities of controlled substances and other evidence affiliated with drug distribution.  I am deputized as a Task Force Officer by the Drug Enforcement Administration ("DEA").  Since November 19, 2011, I have been assigned to the High Intensity Drug Trafficking Area ("HIDTA") Task Force, Northern Virginia Financial Initiative ("NVFI") in Annandale, Virginia.

4.      During my time as a law enforcement officer, I have become knowledgeable about the methods and modes of narcotics operations, and the language and patterns of drug use and trafficking.  I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

5.      Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating parties' cellular telephones or other devices.  It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

2

6.      Based on my training and experience, I also know that information gained through the obtaining of data stored in the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular telephone and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual.

7.      Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones. Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed. These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection. Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

8.      Based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when money was possessed or transferred.

9.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers.

10.     Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set

forth my own personal observations, but rather that which has been provided directly or indirectly to me through other law enforcement officers who made such observations. Additionally, unless otherwise noted, wherever I assert that a statement was made by an individual, such statement is described in substance herein, and is not intended to be a verbatim recitation of such statement. Furthermore, any statements excerpted from recorded conversations, including those that are quoted, are subject to further revision for clarification and/or accuracy.

11.     This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by me or known to the government.

## Confidential Source

12.     During the course of this investigation, investigators have used a cooperating source (hereinafter, "CS-1"). For purposes of this affidavit, the cooperating source will be referred to in the masculine gender regardless of their true gender. The information provided by the cooperating source has been corroborated by consensually monitored telephone calls involving CS-1 and others, text messages, and/or other means. To my knowledge, none of the information provided by the cooperating source has proved to be false, misleading, or inaccurate in any material respect.

13.     CS-1 started cooperating with law enforcement in 2020. CS-1 is an admitted drug distributor and has a prior drug distribution conviction. CS-1 is cooperating with law enforcement in hopes of receiving credit for cooperation after pleading guilty to a federal drug trafficking charge. CS-1 has provided information to law enforcement that has been independently corroborated.

4

**PROBABLE CAUSE**

A.      Background of the investigation

14.     In early 2020, law enforcement obtained information about subjects distributing quantities of controlled substances in the Eastern District of Virginia and elsewhere.  During the course of this investigation, law enforcement has seized large quantities of fentanyl and other controlled substances, along with corresponding evidence that identified WILLIAMS as conspiring with others to distribute controlled substances.

B.      Seizure of fentanyl on June 1, 2020

15.     On June 1, 2020, law enforcement officers executed a search warrant at an address in Arlington, Virginia where CS-1 was residing.  During the execution of the search warrant, law enforcement found evidence consistent with the manufacturing and packaging of suspected controlled substances in almost every room of the three-bedroom apartment.  White powder was prevalent throughout and covered many items.  There were also numerous boxes and/or containers of corn starch, cellulose, caffeine tablets, and Magnesium Sulfate, among other materials which, based on my training and experience, are used as cutting agents by drug traffickers.

16.     In the kitchen area, law enforcement located numerous mixing containers, grinders, scales, and packaging materials with suspected narcotics residue.  A search of the middle island cabinet revealed an empty package displaying LFA Machines, a company that manufactures pill presses.  In the kitchen garbage, officers located additional large amounts of powder,[1] along with

---

[1] Unless otherwise indicated, lab tests of substances found at the Arlington address occupied by CS-1 are pending with the Mid-Atlantic Laboratory of the DEA.

shipping labels and several discarded tablets with markings consistent with controlled prescription tablets. Officers located a machine suspected of being used to press kilogram quantities of narcotics known as a "kilo press" in the kitchen island cabinet. In addition, officers found a blender on the kitchen counter containing a large amount of powder. On July 7, 2020, law enforcement received results of a qualitative analysis, including net weight and identification, conducted by the Mid-Atlantic Laboratory of the DEA. The analysis reflected that the contents of the blender weighed approximately 1,082 grams and was positive for fentanyl.[2]

17.     CS-1, the renter of the apartment, was subsequently arrested and charged federally in this District with drug trafficking. CS-1 later agreed to cooperate with law enforcement in hopes of consideration at sentencing.

C.     Seizure of fentanyl on June 2, 2020

18.     While the search warrant was being executed on June 1, 2020 in Arlington, Virginia, officers located a vehicle associated with CS-1 parked in the garage of the apartment building.

19.     A K-9, Arlo,[3] and his handler conducted a sweep of the vehicle which resulted in a positive alert by Arlo. Following the alert, this vehicle was secured and towed (followed by law enforcement) to the Arlington County Police Department's impound lot.

20.     On June 2, 2020, officers obtained and executed a search warrant of this vehicle. Inside the trunk, officers found one (1) heat sealed black and clear package containing thousands

---

[2] Based on my training and experience, fentanyl is commonly mixed with or substituted for other opioids in counterfeit tablets purporting to be, for example, Oxycodone.

[3] "Arlo" was last certified in April 2019 to alert to the odors of substances including heroin, cocaine, and methamphetamine and is trained on a monthly basis to ensure Arlo's accuracy. Arlington County, Virginia Police Office Anatoliy Biskoup is Arlo's handler.

of tablets with markings consistent with those of Percocet, a prescription controlled substance. Law enforcement also found two (2) heat sealed packages with shapes consistent with the packaging for a kilogram of a controlled substance. One of these packages was silver and the other was clear with a visible white block with an Audi vehicle emblem imprinted on it.

21.     On July 6, 2020, law enforcement received the results of a qualitative analysis, including net weight and identification, conducted by the Mid-Atlantic Laboratory of the DEA. The analysis reflected that the contents of the clear heat-sealed package containing the white substance with the Audi emblem weighed 665.7 grams (without packaging) and was positive for fentanyl and xylazine. Another qualitative analysis conducted by the Mid-Atlantic Laboratory of the DEA Administration reflected the silver heat sealed package weighed 1007.0 grams (without packaging) and was positive for fentanyl.

D.     Historical Information Provided by CS-1 regarding WILLIAMS

22.     CS-1 is a self-admitted distributor of "Molly," heroin, and fentanyl with a prior conviction for drug distribution. CS-1 has provided information to law enforcement that has been independently corroborated. Based on the foregoing, I consider CS-1 to be reliable.

23.     CS-1 began to purchase one hundred (100) to two hundred (200) gram quantities of heroin from a supplier based in Atlanta, Georgia in approximately 2017. CS-1 and WILLIAMS routinely "pooled" money to purchase the heroin, which was transported to the Eastern District of Virginia and elsewhere for further distribution.

24.     In 2019, CS-1 introduced WILLIAMS to a source of supply in Georgia and WILLIAMS began to obtain cocaine and heroin from this unindicted co-conspirator (hereinafter, "UCC-1"). CS-1 stated that UCC-1 would transport large quantities of cocaine and heroin to WILLIAMS in Arlington, Virginia and elsewhere.

25.     According to CS-1, WILLIAMS also utilized an additional unindicted co-conspirator (hereinafter, "UCC-2") in the Washington, D.C. metropolitan area to purchase large quantities of heroin and fentanyl.  WILLIAMS and UCC-2 also manufactured their own pills similar to those seized from CS-1.  CS-1 reported that WILLIAMS and UCC-2 had their own pill presses and they were using fentanyl obtained from UCC-1 or through UCC-2 to make their pills for further distribution.

26.     CS-1 related that in 2020, he (CS-1), WILLIAMS and UCC-2 "pooled" $90,000 to purchase one and a half (1.5) kilograms of fentanyl to manufacture pills.  CS-1 also stated that WILLIAMS often carried a handgun while possessing and distributing controlled substances.

27.     During the course of their relationship, CS-1 met with WILLIAMS and was aware that he stayed at TARGET LOCATION 1.  He stated that WILLIAMS had obtained that premises by utilizing a fraudulent Credit Privacy Number (CPN), under the name of Roger JONES.  A law enforcement database also reflected TARGET LOCATION 1 associated with Roger JONES.  CS-1 stated that WILLIAMS often met with his customers near TARGET LOCATION 1 and that WILLIAMS stored controlled substances, money, and possibly weapons within this premises.

28.     CS-1 stated that WILLIAMS also maintained a "stash house" in North Arlington, Virginia, where he kept additional controlled substances and money.  CS-1 identified TARGET LOCATION 2 as this "stash house" and stated that WILLIAMS also met with customers in the surrounding area.  CS-1 further detailed WILLIAMS' use of the basement of this residence, where he also allowed another unindicted co-conspirator (hereinafter, "UCC-3") to reside and assist in his drug trafficking.

29.     CS-1 communicated with WILLIAMS, who utilized cellular phone number 571-435-4377 and the e-mail address sparkz8122@icloud.com.

8

E.    <u>Subscriber information obtained from T-Mobile</u>

30.    Law enforcement subpoenaed T-Mobile for subscriber information for 571-435-4377 which revealed that it was subscribed to WILLIAMS at 12134 Sawhill Boulevard, Spotsylvania, Virginia.

F.    <u>Communications between CS-1 and WILLIAMS</u>

31.    Following the encounter with law enforcement in June 2020, law enforcement seized various electronic devices from CS-1.  A search of CS-1's cellular telephones revealed communications corroborating CS-1's statements regarding WILLIAMS and their distribution of heroin and fentanyl.  The following table identifies communications regarding the purchase of heroin and fentanyl between CS-1 and WILLIAMS, who was using cellular phone number 571-435-4377 and the email address sparkz8122@icloud.com.

32.    On March 27, 2019, CS-1 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 03/27/19 | CS-1 | U check into the situation |
| 03/27/19 | WILLIAMS | Imma text some people now I ain't get no complaints tho |
| 03/27/19 | CS-1 | Aight imma give u this 10 sauce to hold on to its urs |
| 03/27/19 | CS-1 | Tuck it in the cut for a rainy day |
| 03/27/19 | WILLIAMS | Aite that's a bett my nigg I appreciate that forreal |
| 03/27/19 | CS-1 | Aye they gifted it to me and shit bro u just came through 4 me I woe u it's the least nigga can do show appreciation |
| 03/27/19 | WILLIAMS | He said the last hit strong jack said his people said it made it made them feel like they hit some pack |

9

| DATE | | MESSAGE |
|---|---|---|
| 03/27/19 | WILLIAMS | Jr said no one complained but it's still a lil wet |
| 03/27/19 | WILLIAMS | So idk how honey they being |
| 03/27/19 | CS-1 | Some pack |
| 03/27/19 | CS-1 | Don't trip we might just add dem 10 2 it |

33.    Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 and WILLIAMS are discussing the potency of heroin/fentanyl that CS-1 provided to WILLIAMS for further distribution.

34.    On May 27, 2019, CS-1 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 05/27/19 | CS-1 | I'm been rockin with u since 4eva nigga u had 100k I had 10 Neva switched up |
| 05/27/19 | WILLIAMS | Bro it ain't bout that to me threw all this shit I been threw.  I'm just scared to be broke nobody what I going threw but just thought you would understand |
| 05/27/19 | CS-1 | I do whatever to make sure u or me don't go down that road I gave u shit and sat back a month I really rock with u 100 |
| 05/27/19 | WILLIAMS | I hipp bro I always appreciateive I'm just a point idk what to do this doing last forever. I just want a way to succeed and be susesful in life I done put my family through to much |

35.    Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 discusses WILLIAMS having $100,000, and previously "fronting" drugs on consignment for WILLIAMS to distribute.

36.    On August 8, 2019, CS-1 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/08/19 | CS-1 | 8775 the total for Shawty |

10

| 08/08/19 | WILLIAMS | Shit aight that's a bet!!!! |
| 08/08/19 | CS-1 | And I'm damn near done with the other shit 2 |

37.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 tells WILLIAMS about a total amount paid to a co-conspirator as well as running out of controlled substances for sale.

38.     On August 18, 2019, CS-1 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 08/18/19 | CS-1 | U got the lil machine there? |
| 08/18/19 | WILLIAMS | Not here I'll bring it back tho |
| 08/18/19 | CS-1 | Damn I ji need it tryna put something together |

39.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 is requesting WILLIAMS to bring him the "lil machine" which refers to a pill press.  "Put something together" refers to CS-1 attempting to manufacture pills containing fentanyl.

40.     On August 19, 2019, CS-1 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 08/19/19 | CS-1 | I got 1000 10's coming tomorrow |
| 08/19/19 | WILLIAMS | Aite bett my nigg I'm ready hit me when you out here |

41.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 tells WILLIAMS that he had 1,000 ten milligram pills containing fentanyl for further distribution.

42.     On September 24, 2019, CS-1 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 09/24/19 | CS-1 | Yo I need that machine |
| 09/24/19 | WILLIAMS | Aite gotcha |
| 09/24/19 | WILLIAMS | I'm bout to bring that through |
| 09/24/19 | CS-1 | Aight bet.  I'm not there but Kyle is |

43.     Through my knowledge of this investigation and discussions with CS-1, during this exchange, CS-1 is again requesting WILLIAMS to return his pill press and WILLIAMS agrees to deliver it to CS-1's residence.

G.      Law enforcement seizure of handgun from WILLIAMS on January 15, 2019

44.     On January 15, 2019, in Washington, D.C., law enforcement officers observed a traffic violation of a vehicle operated and solely occupied by WILLIAMS.  During the stop WILLIAMS could not provide a license and began to act very nervously.  A subsequent search of his vehicle resulted in the seizure of a fully loaded Glock handgun.

H.      Law enforcement seizure of pills on October 11, 2019

45.     On October 11, 2019, in Arlington, Virginia, law enforcement officers observed a suspected "hand to hand" transaction which resulted in the stop of WILLIAMS and another unindicted co-conspirator (hereinafter, "UCC-4").  During the stop, UCC-4 was found to be in possession of several pills with markings consistent with prescription controlled substances.  When WILLIAMS was stopped by law enforcement, he dropped a silver cellular telephone and disavowed any knowledge or ownership of it and had another phone in his possession.  Both phones were seized by law enforcement.  WILLIAMS was also found to be in possession of $531

in U.S. currency.

    I.    <u>Communications between WILLIAMS and UCC-2</u>

    46.    Pursuant to search warrants, law enforcement reviewed the contents of the cellular telephones seized from WILLIAMS on October 11, 2019.  A phone download of the phones found one to utilize cellular phone number 716-986-6209 and e-mail <u>bmgshit@icloud.com</u>.  The other phone utilized cellular phone number 571-435-4377 and e-mail <u>sparkz8122@cloud.com</u>.  The following tables identifies communications between WILLIAMS and UCC-2 regarding suspected drug trafficking activities.

    47.    On July 4, 2019, UCC-2 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 07/04/19 | WILLIAMS | You got them blue things? |
| 07/04/19 | UCC-2 | All out will have them again Saturday |
| 07/04/19 | WILLIAMS | Aite lmk some just hit me for em |

    48.    Through my knowledge of this investigation and discussions with CS-1, during this exchange, "blue things" refers to manufactured tablets resembling prescription controlled substances which actually contain fentanyl.

    49.    On August 13, 2019, UCC-2 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/31/19 | UCC-2 | Oh ok was tryna see if you still had that lil small machine |
| 08/31/19 | WILLIAMS | Yea I still got it you need it? |
| 08/31/19 | UCC-2 | Yea tip was tryna use it right quick |
| 08/31/19 | UCC-2 | I was gonna ask if you could help him lol |

13

50.     Through my knowledge of this investigation, "lil small machine" refers to a pill press utilized to manufacture tablets with fentanyl.

51.     On September 26, 2019, UCC-2 and WILLIAMS exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 09/26/19 | WILLIAMS | I just gave dude shit to my manz they was like naw go back to the other lol |
| 09/26/19 | UCC-2 | From the 5-10? |
| 09/26/19 | WILLIAMS | I gave him that pick [CS-1] gave me he was like naw they loving your homie shit Rn |
| 09/26/19 | UCC-2 | That really shouldn't matter but just add 5 to it then lol |
| 09/26/19 | WILLIAMS | I was like hold up but yea I gave his as it was |
| 09/27/19 | UCC-2 | Lmmfao I thought you was saying they ain't like how you switched |
| 09/27/19 | WILLIAMS | We definitely on point let's get money |

52.     Through my knowledge of this investigation and discussions with CS-1, during the exchange, WILLIAMS tells UCC-2 about customers comparing the quality of pills made by them to pills provided by CS-1.  When UCC-2 talks about going "from the 5-10," UCC-2 is referring to adding a larger amount of fentanyl to the ingredients utilized to make the pills.

J.      Information from Apple iCloud Search Warrant

53.     In September 2020, a federal search warrant was obtained for Apple iCloud records pertaining to WILLIAMS based on the previously mentioned phone numbers and e-mails.  Law enforcement reviewed the materials provided by Apple (which ran until September 11, 2020),

which included iMessages, chats, SMS, MMS, images, and other data.  During the review of the downloaded contents, several messages were located between UCC-2 and WILLIAMS which were indicative of suspected drug trafficking and corroborated previously mentioned details of the criminal conspiracy.

54.     On February 23, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 02/23/20 | WILLIAMS | You got a stack in here |
| 02/23/20 | UCC-2 | Aght I'll get it later lol |
| 02/23/20 | UCC-2 | Man I put some shit together Lastnight before I left that shit had me sick af |
| 02/23/20 | UCC-2 | Make sure you put something over your face & hands |
| 02/23/20 | WILLIAMS | Aite bet looks too my nigg this joint bout to get me right |

55.     Through my knowledge of this investigation, during this exchange UCC-2 is advising WILLIAMS about the effects of manufacturing pills based on the adverse reactions to the fentanyl.  "Put some shit together" refers to making the pills.

56.     On February 24, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 02/24/20 | WILLIAMS | My folks giving some weird feed back |
| 02/24/20 | UCC-2 | On what? |
| 02/24/20 | WILLIAMS | The new situation |
| 02/24/20 | UCC-2 | For real what they say? |
| 02/24/20 | UCC-2 | I gave some out before I made the move to make sure |

15

| 02/24/20 | WILLIAMS | Two people said it made them trip out and paranoia instantly |
|---|---|---|
| 02/24/20 | UCC-2 | That's crazy smh |
| 02/24/20 | WILLIAMS | Other people said it's cool tho |
| 02/24/20 | UCC-2 | I haven't had 1 complaint |
| 02/24/20 | UCC-2 | Imma hit him up |
| 02/24/20 | UCC-2 | I never heard that before ever |
| 02/24/20 | UCC-2 | Shit seem the same & smelled the same |
| 02/24/20 | WILLIAMS | Yeah they said everything else the same idk |
| 02/24/20 | UCC-2 | Shit had me about to throw up |
| 02/24/20 | UCC-2 | Imma hit him up |
| 02/24/20 | WILLIAMS | Imma see what they say tomorrow |
| 02/24/20 | UCC-2 | Same person same situation that's cracy |
| 02/24/20 | UCC-2 | Fuck I'm mad I'm not home |
| 02/24/20 | WILLIAMS | It's cool don't stress it |
| 02/24/20 | UCC-2 | Because I don't wanna wait days to have to return it |
| 02/24/20 | UCC-2 | I wonder what that's about tho |
| 02/24/20 | UCC-2 | Shid that's a lot for that to be a issue |
| 02/24/20 | WILLIAMS | Put a lot together |
| 02/24/20 | WILLIAMS | But I think it's good fr |
| 02/24/20 | WILLIAMS | Just maybe the new cut |
| 02/24/20 | WILLIAMS | Idk |
| 02/24/20 | UCC-2 | Hmmmmmmm shouldn't be that tho because I always use that |
| 02/24/20 | UCC-2 | I don't be buying that high ass shit lol |
| 02/24/20 | UCC-2 | How many ppl complained just 2? |
| 02/24/20 | WILLIAMS | Yeah both said the same thing |
| 02/24/20 | UCC-2 | That's weird as shit |
| 02/24/20 | UCC-2 | I just hit him up tho |
| 02/24/20 | WILLIAMS | Aite that's a bet |
| 02/24/20 | UCC-2 | I'm about to see what my other folks think |
| 02/24/20 | UCC-2 | That 1 person said a 10 |
| 02/24/20 | UCC-2 | How many ppl you give it to |
| 02/24/20 | WILLIAMS | 3 so far |

| 02/24/20 | WILLIAMS | & 2 said no |
|----------|----------|-------------|
| 02/24/20 | UCC-2 | Damn |
| 02/24/20 | UCC-2 | I'm waiting for him to respond he might not hit me back til the morning tho |
| 02/24/20 | WILLIAMS | Aite imma try to get some more feedback |
| 02/24/20 | UCC-2 | That's crazy as shit tho I swear I've never heard that before |
| 02/24/20 | UCC-2 | How much you use of it |
| 02/24/20 | WILLIAMS | The normal 20 on 50 yeah it's weird af |
| 02/24/20 | UCC-2 | Oh I thought you said you out a lot together |

57.     Through my knowledge of this investigation, during this exchange WILLIAMS and

UCC-2 are discussing the quality of the pills that were made and complaints that various customers

had made about their potency.  UCC-2 talks about possibly returning the property to the supplier.

"The normal 20 on 50" is consistent with talking about the mixture of precursor ingredients and

fentanyl to manufacture pills.

58.     On March 7, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 03/07/20 | WILLIAMS | What your people saying |
| 03/07/20 | UCC-2 | They like that 1 better |
| 03/07/20 | WILLIAMS | Fuck imma mix em up I only got a lil of the first one left |
| 03/07/20 | UCC-2 | We gonna get back on track my shit been boomin like shit |
| 03/07/20 | WILLIAMS | You already know RN the time to eat and stack this shit |
| 03/07/20 | WILLIAMS | I know your line rocking just keep staying consistent |

17

59.     Through my knowledge of this investigation, during this exchange WILLIAMS and UCC-2 are discussing the quality of the fentanyl.  WILLIAMS is advising the he is going to combine what he had previously purchased from UCC-2 with what he just purchased.

60.     On March 18 and March 19, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
| --- | --- | --- |
| 03/18/20 | WILLIAMS | You want me to come now? |
| 03/18/20 | UCC-2 | Yea Bianca coming I can't leave this machine running lol |
| 03/18/20 | WILLIAMS | Aite bet |
| 03/19/20 | WILLIAMS | Imma get som lil joint from you tomorrow |
| 03/19/20 | UCC-2 | Which 1's |
| 03/19/20 | UCC-2 | & did you check that |
| 03/19/20 | WILLIAMS | I'm tryna get a feedback now but 200 rp and idk how many 30's yet |
| 03/19/20 | UCC-2 | I swear if they say they don't like that they lying |
| 03/19/20 | UCC-2 | I got some food feedback so far |
| 03/19/20 | WILLIAMS | Aite bet no complaints I think we good I'll have that at the crib if you want to pick it up tomorrow |
| 03/19/20 | UCC-2 | Ok cool I'll be out early again prolyl |
| 03/19/20 | UCC-2 | Try to keep the shit separate the hallucinating stuff |
| 03/19/20 | UCC-2 | & the last stuff if you can |
| 03/19/20 | WILLIAMS | Aite yeah it's still seperate |

61.     Through my knowledge of this investigation, during this exchange, UCC-2 is talking about the "machine" running.  "Machine" is believed to refer to a pill press.  "200rp" and "30's" refers to pills manufactured with fentanyl with marking consistent with prescription medications.

62.     On March 29, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 03/29/20 | WILLIAMS | You got the lil 10's? |
| 03/29/20 | WILLIAMS | Aite bet |
| 03/29/20 | WILLIAMS | Add 200 more 30 with everything else<br>550<br>300 |
| 03/29/20 | UCC-2 | 200<br>350 |
| 03/29/20 | UCC-2 | That's right?<br>450-30 |
| 03/29/20 | WILLIAMS | 600-rp<br>250-yellow |

63.     Through my knowledge of this investigation, during this exchange WILLIAMS is asking about the availability of "10's".  "10's" refers to pills with fentanyl with markings consistent with Oxycodone 10 mg pills.  WILLIAMS further orders "30", "rp", and "yellow" which refers to other pressed pills.

64.     On July 27, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 07/27/20 | WILLIAMS | Aye my nigg I was tryna to get a real response from people but they not liking that joint idk what's wrong with it you think your mans will take it back? |

| 07/27/20 | UCC-2 | Which 1 |
|---|---|---|
| 07/27/20 | UCC-2 | The 200? |
| 07/27/20 | UCC-2 | How much you putting on it |
| 07/27/20 | UCC-2 | & are you doing it how I said with that sift thing? |
| 07/27/20 | UCC-2 | That shit had me sick af |
| 07/27/20 | UCC-2 | I think they are going off color or something |
| 07/27/20 | UCC-2 | I aint' have no complaints this time |
| 07/27/20 | UCC-2 | My other mans said he gonna be back with that old torch we use to get tomorrow |
| 07/27/20 | WILLIAMS | Aite that's bet but I'm doing 20 on 30 |
| 07/27/20 | WILLIAMS | You think that's too much? |
| 07/27/20 | UCC-2 | Hell no that's not to much |
| 07/27/20 | UCC-2 | Are you sifting it tho? |
| 07/27/20 | UCC-2 | You can't just blend because it's not gonna get all the way through it |

65.    Through my knowledge of this investigation, WILLIAMS and UCC-2 are discussing the manufacturing of pills with fentanyl and the use of a sifter to mix the ingredients. UCC-2 also confirms that she was reconnecting with a previous supplier of fentanyl.

66.  Beginning in July 2020, messages were exchanged between UCC-2 and 571-344-0885. During these messages, the user of the 571-344-0885 referred to himself as "Sparks," a frequently used nickname for WILLIAMS.

67.    On July 28, 2020, WILLIAMS and an additional unindicted co-conspirator (hereinafter, "UCC-5") exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 07/28/20 | UCC-5 | What's your address are you still at the same spot |
| 07/28/20 | WILLIAMS | 575 12th St s Arlington |

68.     Through my knowledge of this investigation and information provided by CS-1, WILLIAMS is confirming with UCC-5 that he is still utilizing TARGET LOCATION 1.

69.     Additional similar messages with other suspected customers for controlled substances of WILLIAMS were found following this message and also in August 2020.

70.     On August 5, 2020, WILLIAMS and UCC-2 exchanged the following messages:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 08/05/20 | WILLIAMS | I got pulled and this girl took the gun charge smh |
| 08/05/20 | UCC-2 | Why they search the car? |
| 08/05/20 | UCC-2 | She must really like you |

71.     Through my knowledge of this investigation, WILLIAMS is relating the events outlined below in which law enforcement seized a handgun from a female occupant (hereinafter, "F-1") of a vehicle that she and WILLIAMS had been operating.  "Took the gun charge" refers to her claiming the gun belonged to her when it was really his.

K.      Communications between UCC-3 and WILLIAMS

72.     During the review of the cellular phone used by WILLIAMS with the number 571-435-4377, law enforcement was also able to review images created by the user of the phones.  Law enforcement found the following communications in August 2019 between WILLIAMS and UCC-3 who resides at TARGET LOCATION 2:

| DATE | FROM | MESSAGE |
|------|------|---------|
| 08/28/19 | UCC-3 | Dude coming to close up holes in the spot so I put everything in the cabinet in the uqib bag |
| 08/29/19 | UCC-3 |  |
| 08/29/19 | UCC-3 | It's in the bag neat so pick it up gently |
| 08/29/19 | WILLIAMS | Aite bet good looks I'm bout to head over there in a sec |

73.     Through my knowledge of this investigation, along with my training and experience, the image in this exchange is of a "kilo press" which is similar to the presses seized from the vehicle of CS-1.  As mentioned above, UCC-3 is known, through surveillance, law enforcement databases, and phone subscriber records, to reside at TARGET LOCATION 2.

L.     Seizure of a handgun and additional communications in August 2020

74.     As previously stated, on August 5, 2020 in Arlington, Virginia, law enforcement conducted a traffic stop of a vehicle operated by WILLIAMS and F-1.  During the stop, the F-1 was found to have a Glock 9mm handgun concealed in her armpit area (not under clothing or a holster).

22

75.     On August 13, 2020 and August 14, 2020, WILLIAMS and an additional uninducted co-conspirator (hereinafter, "UCC-6") exchanged the following messages:

| DATE | FROM | MESSAGE |
|---|---|---|
| 08/13/20 | UCC-6 | Need more blue |
| 08/13/20 | WILLIAMS | Gotcha |
| 08/13/20 | UCC-6 | U got a 100 |
| 08/13/20 | WILLIAMS | Yeah |
| 08/14/20 | UCC-6 | Got another 100 |
| 08/14/20 | WILLIAMS | Yes |
| 08/14/20 | UCC-6 | Actually 200 |

76.     Through my knowledge of this investigation, UCC-6 is arranging to purchase fentanyl pills ("Blue") from WILLIAMS.  UCC-6 originally asks for one hundred (100) then changes the amount to two hundred (200).

M.     Location information obtained through iCloud search warrant results

77.     Law enforcement also conducted a review of locations services affiliated with images obtained through the Apple iCloud download from WILLIAMS' account.  On numerous occasions, images had a "geotag" which included longitude and latitude positioning which corresponded to the location the images, or photos, were taken.  On numerous occasions between June and late August 2020, the "geotag" reflected images being taken at, or in the direct vicinity of, TARGET LOCATION 1 and TARGET LOCATION 2.

N.     Law enforcement incident at TARGET LOCATION 1 involving WILLIAMS and F-1 on October 14, 2020

78.     On October 14, 2020, in Arlington, Virginia, law enforcement encountered F-1 following a report of a suspected domestic dispute in front of TARGET LOCATION 1.  Upon arrival, law enforcement met with F-1, who advised that she had gotten into an argument with

23

WILLIAMS inside of TARGET LOCATION 1 and he had struck her.  F-1 confirmed that she had stayed with WILLIAMS at TARGET LOCATION 1 on several occasions over the past months and that this was his primary residence.  WILLIAMS is currently charged by Arlington County with assault and battery and there is an outstanding warrant out for his arrest on that charge.  Based on my training and experience, it is my belief that if arrested, WILLIAMS will seek to have associates remove any drug paraphernalia, proceeds, and narcotics themselves contained in TARGET LOCATION 1 and TARGET LOCATION 2 at the earliest possible date.

O.     Surveillance conducted at TARGET LOCATION 2

79.     Between June 2020 and October 16, 2020, law enforcement conducted periodic physical and electronic surveillance at TARGET LOCATION 2.  During these surveillances, UCC-3 and WILLIAMS were observed on numerous occasions at this location, almost always making entry to the premises through a basement door.

80.     On October 14, 2020, law enforcement observed WILLIAMS enter TARGET LOCATION 2.

81.     On October 15, 2020, law enforcement observed WILLIAMS enter TARGET LOCATION 2.  After a short period, WILLIAMS exited TARGET LOCATION 2 and went to a vehicle parked in front, and then returned into the premises carrying a "backpack."  WILLIAMS exited shortly after without the "backpack."

**USE OF CELLULAR TELEPHONES/STORAGE MEDIA BY DRUG TRAFFICKERS**

82.     Based on my training, experience, and participation in narcotic and drug-related investigations, and my knowledge of this case, I know that:

a.   It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages)

24

and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

b.  Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

c.  Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations.  It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

d.  Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

83.     In my training and experience, it is likely that the LOCATIONS will contain at least one cellular phone because of the use of cellular phones in furtherance of the conspiracy to distribute controlled substances described above.  Further, I know that WILLIAMS has used cellular phones to communicate about drug transactions as described above.

84.     I know from my training and experience, as well as from information found in publicly available materials including those published by cellular phone providers, that some makes and models of cellular phones offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

25

85.     If a user enables Touch ID on a given cellular phone device, he or she can register fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In my training and experience, users of cellular phone devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents.  This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

86.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked, and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked cellular phone device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

87.     The passcode or password that would unlock the cellular phone is not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user(s) of the cellular phone to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant cellular phone device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the

government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

88.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the TARGET LOCATION 1 and TARGET LOCATION 2 to press their finger(s) against the Touch ID sensor of the locked cellular phone device(s) found during the search of the TARGET LOCATION 1 and TARGET LOCATION 2 in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

89.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled cellular phone device via the fingerprints on thumbs or index fingers.  In the event that law enforcement is unable to unlock the cellular phone as described above within the attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

90.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at TARGET LOCATION 1 and TARGET

LOCATION 2 to the Touch ID sensor of cellular phones for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

91.     After any cellular phones are seized, law enforcement will attempt to search them. If law enforcement cannot complete the search, then agents will send the phones to a government laboratory or a private company that specializes in data extraction from electronics.

### TECHNICAL TERMS

92.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  *IP Address*:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.  *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    c.  *Storage medium*: A storage medium is any physical object upon which

28

computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

93.     As described above and in Attachment B, this application seeks permission to search for records that might be found in TARGET LOCATION 1 or TARGET LOCATION 2, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

94.     *Probable cause.* I submit that if a computer or storage medium is found in TARGET LOCATION 1 or TARGET LOCATION 2, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition,

29

a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

95. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in TARGET LOCATION 1 or TARGET LOCATION 2 because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail

programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations,

31

computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

96. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either

33

seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

     c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

97.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

98.    *Because* several people share TARGET LOCATION 1 and TARGET LOCATION 2, it is possible that the locations will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**CONCLUSION**

99.    Based on the foregoing, I submit that there is probable cause to believe that WILLIAMS and other individuals, both known and unknown, have and are continuing to conspire to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I further believe that WILLIAMS stores narcotics and drug proceeds at/in TARGET LOCATION 1 and TARGET LOCATION 2. Furthermore, there is probable cause to believe that evidence and instrumentalities of the crimes described herein and as set forth more fully in Attachment B to the warrant applications, incorporated herein by

reference, are contained or secreted within the confines of TARGET LOCATION 1 and TARGET

LOCATION 2.

Respectfully submitted,

Stacey Nyie
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 by telephone on
October 20, 2020.

Digitally signed by Michael S.
Nachmanoff
Date: 2020.10.20 16:11:52 -04'00'

The Honorable Michael S. Nachmanoff
United States Magistrate Judge

**ATTACHMENT A-1**

*Property to be Searched*

The premises to be searched is the following:  575 South 12th Road # 1516, Arlington, Virginia 22202, within the county of Arlington.  The property is a multi-level brick apartment building known as "The Acadia."  There is an overhang over the front door and the name "The Acadia" is displayed horizontally on the overhang and above the front door.  The number "575" is displayed in gold to the left of the front entrance.  The structure consists of red brick and a gray stone façade in front.  The door to # 1516 is brown in color and the number "1516" is displayed on a square placard on the wall directly next to the apartment door.



**ATTACHMENT A-2**

*Property to be Searched*

The premises to be searched is the following, including any and all structures and/or vehicles located within the curtilage thereof:  4617 North 13th Street, Arlington, Virginia 22207, within the county of Arlington.  The premises is located at the intersection of North Glebe Road and North 13th Street.  The property is a single-family home.  There is an overhang over the front door and the numbers "4617" are displayed horizontally on the overhang and above the front door.  The structure consists of yellow siding and it has white window frames.  The driveway is to the left of the front door but there is no garage at the end of the driveway.



## ATTACHMENT B

*Property to be Seized*

    1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute and possess with intent to distribute, controlled substances):

    a.   Controlled substances, including but not limited to: fentanyl;

    b.   Items commonly associated with the packaging and sales of controlled substances, including plastic bags or zip lock bags;

    c.   Photographs and/or video, in particular photographs and/or videotapes of potential co-conspirators and their criminal associates, assets, and/or controlled substances and/or firearms, along with personal address lists, and other documents with the names and telephone numbers of potential co-conspirators;

    d.   Records, correspondence, narcotic customers lists, narcotic suppliers lists, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential coconspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transporting, ordering, purchasing, or distributing of controlled substances;

    e.   Records relating to the use of and accumulation of proceeds derived from the sale of fentanyl or any other illegal controlled substances, as well as the acquisition of property obtained from drug proceeds, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money obtained from drug sales, including records of large purchases, receipts, canceled checks, bank records, credit card records, wire transfers, wire transfer receipts, cashier's checks, cashier's check receipts, addressed mail, express delivery receipts/envelopes, utility company receipts, rent receipts, income tax returns, money drafts, money orders, and their receipts;

    f.   Financial records including expenses incurred in obtaining the equipment and items necessary for the transportation and/or distribution of controlled substances, income derived from the sales of controlled substances, as well as records of legitimate income or lack thereof, and general living expenses;

    g.   United States currency in excess of $1,000, cryptocurrency also known as virtual currency, including bitcoin, stored on electronic or paper wallets or other means, cryptocurrency private keys and recovery seeds, gift cards, cash cards, and records relating to income derived from the transportation, sales, and distribution of controlled substances and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, checkbooks, check registers, securities, precious metals, jewelry, antique or modem automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit controlled substances trafficking;

h. Documents indicating travel in interstate and foreign commerce, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

i. Firearms, including, but not limited to, firearms parts, accessories, holsters, and ammunition;

j. Any digital device used to facilitate the above listed violations and forensic copies thereof;

k. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the categories of items to be seized described herein:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the use of virtual private networks and the TOR network including, but not limited to, access of darknet marketplaces;

    iv. evidence of the attachment of other devices;

    v. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    vi. evidence of the times the device was used;

    vii. passwords, encryption keys, PGP keys, recovery seeds, and other access devices that may be necessary to access devices;

    viii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    ix. records of or information about Internet Protocol addresses used by the device; and

      x.     records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," "materials," and "information" include all forms of creation or storage, including in digital form on any digital device and any forensic copies thereof as well as any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3.   As used herein, the term "computer" is an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

4.   As used herein, the term "storage medium" includes any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

5.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

6.   For any computer or storage medium whose seizure is otherwise authorized by the search warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER").

      a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs,

registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the use of virtual private networks and the TOR network including, but not limited to, access of darknet marketplaces;

f.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

g.    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

h.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

i.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

j.    evidence of the times the COMPUTER was used;

k.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

l.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

m.    records of or information about Internet Protocol addresses used by the COMPUTER;

n.    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

o.    Routers, modems, and network equipment used to connect COMPUTERs to the Internet; and

4

     p.  contextual information necessary to understand the evidence described in this Attachment B.

     7.  During the execution of the search of the **TARGET LOCATIONS** described in Attachments A-1 and A-2, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the **TARGET LOCATIONS** to the Touch ID sensor of any Apple brand device(s), such as an iPhone or iPad, found at the **TARGET LOCATIONS** and to hold the digital devices found at the **TARGET LOCATIONS** in front of the face of individuals found at or in the **TARGET LOCATIONS** with the individuals' eyes open to activate the facial-, iris-, and/or retina-recognition features for the purpose of attempting to unlock the device via Touch ID, Face ID or similar biometric features in order to search the contents as authorized by this warrant.

     8.  The search warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the Drug Enforcement Administration may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

     9.  Any locked container such as a safe may be searched for the property to be seized set forth herein;

     10. If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of government attorneys and agents is established.  The filter team will have no previous or future involvement in the investigation of this matter.  The filter team will review all seized communications and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege.  At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys.  The filter team then will provide all communications that do *not* involve an attorney to the investigative team and the investigative team may resume its review.  If the filter team decides that any of the communications to/from attorneys are not actually privileged (*e.g.,* the communication includes a third party or the crime-fraud exception applies), the filter team must obtain a court order before providing these attorney communications to the investigative team.  This investigation is presently covert and the government believes that the subject(s) of the search is not aware of this warrant.